Thank you, Your Honor. Erin Kevorkian on behalf of the appellant, Eric Romero-Lobato. I would like to try and reserve five minutes, and I will keep track of my time. So today, unless the court directs me otherwise, I'd like to primarily focus on three points in Mr. Romero-Lobato's proceedings, at which the district court failed to uphold its necessary gatekeeping rule, resulting in convictions that rest on fundamentally unreliable evidence. So first, as to the Aguitas Bar trial, the district court erroneously permitted a suggestive and unreliable first-time in-court identification of Mr. Romero-Lobato by the bar owner. Second, during the same trial, the district court erroneously permitted expert testimony that the spent bullet and casing found at the Aguitas Bar conclusively came from or were fired from the gun later recovered in the Yukon SUV. And third, as to the carjacking trial, the district court erroneously permitted Henriette's one-person show-up out-of-court identification, as well as her tainted in-court identification. Your Honors, it's the district court, the trial court, that stands as the first line of defense against fundamentally unfair and prejudicial evidence from ever reaching the jury. And although cross-examination can be an important tool for any party, the Supreme Court recognizes it's inherently limited and cannot be viewed as an absolute safeguard of accuracy and reliability. The district court's repeated failure here to serve this crucial gatekeeping role warrants reversal. Turning to the first issue, the district court committed reversible error by permitting the Aguitas owner to make the first-time identification of Mr. Romero-Lobato in court without an adequate foundation to do so. So when, as here, the government intentionally arranges a first-time in-court identification, a procedure that's already recognized as deeply suggestive, while the government also does so knowing that the witness has failed to reliably identify the defendant pretrial, but not only that, has even more recently attempted to identify another man as a suspect. I thought he was shown, his daughter showed him a photograph at some point earlier. He took that photograph and he compared that to the surveillance video and he saw a match there, too. So we don't know, so a couple of points here, Your Honor. The first problem with this is that as far as we know in the record, no identification was ever made to the government or to officers. We also don't really know… …on that point you just made. I mean, that sounds like a fair argument in terms of why we might doubt his recollection of seeing this photograph, but why wouldn't that just be subject to cross-examination? So he was cross-examined on this out-of-court viewing of the picture. The problem in this case is that can't fairly be described as an identification made to the government. The first identification procedure that we have here is when the bar owner is in court as a testifying witness and at that point identifying Mr. Romero-Lobato. And so that's the procedure here that's problematic, especially given what occurred before. So we have the day of the robbery. The bar owner can't identify anyone. He doesn't really provide a description to responding officers of either suspect. He does view this photographic six-pack, isn't able to identify anybody. We do know, as Your Honors mentioned, at some point after that he's shown isolated photographs from his daughter. But then just days before trial, we have the bar owner looking at the same six-pack of photographs with the government and with officers during a pretrial procedure and saying, oh, I didn't see him before, but I see him now, referring to the suspect. When you say pretrial procedure, what was it? This occurred approximately a week before trial. My understanding is it was just the government's opportunity to prepare their witnesses for trial. Witness prep, okay. Right. So it's at this point where he's with officers and government attorneys, and he attempts to make this identification. But in the government's words, instead of following up, the government simply moved on. Wasn't that the subject of examination as well? It was brought up during cross-examination, but I think there's two problems with that here. I mean, the first problem is this issue really concerns the district court's duty to screen this evidence for reliability at the outset. And I think that there are some circumstances and some proposed testimony, and we submit that this is absolutely one of those circumstances where the proposed evidence is so suggestive and so unreliable that that does trigger the district court's duty to screen this evidence. And what we also know on this record is that it should never have come in. Again, even though cross-examination certainly is an important tool, evidence of this nature, especially eyewitness identification evidence, right, which is frankly some of the most powerful evidence that can be submitted to a jury during a trial, simply wasn't able to overcome the gatekeeping failure that occurred in this case. So at a minimum, the district court should have conducted the screening procedure for reliability, but we submit that we also know on this record that this testimony simply failed to meet any threshold, any minimum threshold reliability requirements for admission, and it should have been excluded. What case would you direct this to from our court that would sort of best support you on this point? These circumstances are pretty unique. I will say I haven't, especially from this court, I don't know that there is a case really on all fours here. What I would direct this court to is a Supreme Court's decision in Perry, Perry v. New Hampshire. We have cited it in the briefing. The one caveat I would have to that is that I think Perry is helpful for the general principles and some of the cautionary language in that case, but Perry, of course, did concern an out-of-court identification, not a challenge to an in-court identification. So I think what this court can take from Perry today is the court's repeated instruction that reliability is the linchpin in determining the admissibility of identification testimony, and that's what was lacking in this case. Turning then to the second error in the Aguitas Bar robbery trial, the district court erroneously failed to limit the firearm examiner Johnson's testimony to preclude conclusive statements of probability or certainty. And so certainly we maintain our separate arguments that we made in the brief on this point, that the district court committed legal error by shifting the burden, and also that the district court shouldn't have let this testimony come in at all. However, what I'd like to focus on today is that at a minimum, the nature of the testimonial conclusion given to the jury by Johnson needed to have been limited to what the evidence can support. So here on direct examination, Johnson twice testified without qualification, without limitation, that the Yukon gun fired the bullet encasing found at the Aguitas Bar. Was there an objection? There was an objection to this, Your Honor. So after the second time that he made the same conclusive statement, defense counsel did object, yes, Your Honor. His report, Johnson's report, was also admitted into evidence and made available for the jury to review. And same thing, conclusions in the report were definitive and without qualification. But courts, however, are beginning to recognize that a wholly unqualified source attribution statement, like the one made here, is not scientifically supported by toolmark analysis. So I know we gave a number of different decisions in the briefing. I would like to just focus on a couple here and bring the court's attention first to Judge Rakoff's decision in United States v. Glenn. Now in Glenn, Judge Rakoff did permit the ballistics testimony to come in, but recognizing some of the inherent dangers in the AFT method at issue, he only permitted the expert to state in terms of what was more likely than not to have occurred, but nothing more. So he provided some kind of limitation there. In another case, United States v. Tibbs coming out of the D.C. Superior Court, again, the court in that case did permit the testimony to come in, but took it even a step further and provided that the expert could only testify that the recovered firearm could not be excluded as the source of the cartridge casing. And we have courts taking it a step further, such as in Adams, and only permitting observational. Did Johnson say something to the effect, and I may not be quoting him exactly, but that he couldn't exclude all other firearms? Johnson only came back and said that during cross-examination. And Johnson also said during cross-examination, rather than really delving deeper into, I mean, he was cross-examined on the method itself, but at this point rather than deeping further into the inherent limitations of this methodology, Johnson said, well, I can't say it's the exclusion of every firearm in the world because I can't test every firearm in the world. The problem with this is twofold. So first, and hearkening back to our discussion a moment ago, cross-examination is not a cure-all here. But especially in the context of erroneously admitted expert testimony, it's particularly ineffective because the reason that we qualify experts to testify is specifically because there's this lack of background knowledge on behalf of jurors. And so as this court has recognized, I believe it was in United States v. Amaral, experts have this special aura of reliability and trustworthiness about them. And so cross-examination is then necessarily handicapped because of this specific lack of background knowledge that jurors have. They're not able— You know, we have one decision, I think also called Johnson, United States v. Johnson, where this came up, we held that it was not an abuse of discretion to allow this. So what takes this case out of that? The difference between this case and Johnson is that in Johnson, there was a limitation in that case. I believe in Johnson, the expert testified that he couldn't— it was to a reasonable degree of ballistic certainty in the Johnson case. And in this case, we don't even have that. Again, we have an expert testifying conclusively during his direct with the government going through it that this was the firearm that fired these bullets. And so regardless—I know we gave a number of examples. Regardless of what the appropriate limitation was here, what distinguishes this case from other cases, including Johnson, is that there was simply no limitation whatsoever. Is your argument that it was an abuse of discretion to do so, given the factual circumstances? Or is it that you're arguing something broader, that an expert can't— if an expert ever says something in absolute terms, that itself nullifies that expert's opinion? Our argument here is that the testimony that the expert provides has to be limited to what— whatever methodology underlies the expert's opinion, his testimony must be limited to what's supported by that methodology. So in the context of the AFT method, we know from the way that this method works, quite frankly, it's wholly subjective, right? So we don't have a level of certainty coming from this method of examination. So it was—so yes, Your Honor, it was an abuse of discretion in this case to permit the expert to testify conclusively that it was the recovered firearm that fired these— If we were to hold that, is there any other court that has held that allowing in this kind of testimony is an abuse of discretion under Daubert? Allowing in the— The AFTE, because it seems like it's been allowed in a lot of cases. And I think either the district court said that or we've said that before. A lot of other courts have said that. And you pointed out some reasons to be concerned about this, but the district courts perform a gatekeeping function. It comes up here, and there's a pretty full record here. The district court spent a lot of time on this issue, and I guess my question is if we were to reverse him on this, reverse the district court on this, would we be essentially starting a new trend? I don't know that this court would necessarily be setting a new trend, given that there are a number of district courts across the nation, and I believe state courts, too, but I don't believe that we cited those in the briefing. But a number of courts across the nation that are beginning to recognize that this testimony, at a minimum, must be limited. So I am not aware of a case on appeal that has precluded the testimony altogether. I mean, we certainly maintain that this doesn't meet the Daubert standard for admissibility for the reasons we've outlined in the briefing. But, again, I think the more—at a minimum, a more limited approach that this court could take is that it was an abuse of discretion to at least not limit it to what is reasonably supported. Your time is getting a little short, but I did want to hear from you on that third point you were going to discuss about the one-person ID and the carjacking. Thank you, Your Honor. So turning to the third issue, then, there doesn't appear to be any dispute among the parties that the out-of-court show-up was unduly suggestive. We've also briefed the various reliability factors, and so I won't—unless the court has a specific question. I wasn't going to delve deep into those today, but the one point that I would like to emphasize here is that courts must weigh these reliability factors against the corrupting effect of the identification itself, and that comes from the Supreme Court's decision in Manson v. Braithwaite. And so in this case, when evaluating what happened, right, so Ms. Henriette is informed by officers that they have found the man driving her car. She is immediately taken to the scene. She sees her car crashed, totaled, and then one man, one Latino man, is paraded in front of her in handcuffs, and that's when she makes her identification. We submit that under these circumstances, this testimony was wholly suggestive as recognized, but wholly unreliable. Is there anything other than the suggestive nature? Is there any evidence that suggests that she may have been wrong here or her identification was unreliable? Well, I suppose kind of going through it, you know, we have, I believe that the government kind of points to, first of all, we have the surveillance video. As the court knows, the surveillance video really doesn't reveal anything, right? You certainly can't see the identity of the alleged perpetrator. It really doesn't reveal any particular characteristics. We do have some kind of conflicting descriptions in what she may have told officers, so her written statement doesn't contain a description at all. Later she testifies the man was Latino but couldn't really describe anything more. She says, like a cholo, but then she can't describe what that means. What about the fact that they had a pretty close human interaction that had taken place not that long prior? Certainly she did have some opportunity to view him, but I think we know, and I do believe that the amicus briefing expands a little bit more on this, is that under these high-pressure, frightening, there was a weapon involved, kind of fast-paced type of interactions, we know that eyewitness identifications are not always the most reliable under these circumstances. I would last leave the court with the fact that officers later observed Mr. Romero-Lobato get into the car really doesn't even come close to proving the elements of carjacking. Officers didn't view who committed the crime, they didn't view who drove the car to the home, and I believe one government witness even testified that stolen cars can be turned over rather quickly. So at most we submit to the court that at most Mr. Romero-Lobato may have possessed a stolen vehicle, but on this record the government failed to prove that he had committed a carjacking once excluding this improperly admitted evidence. And unless the court has any further questions, I'll go ahead and reserve for rebuttal. Okay, great. Thank you. Thank you. Thank you, and may it please the court. Joel Johnson on behalf of the United States. The district court did not abuse its discretion in admitting toolmark analysis testimony in this case. This court has already affirmed admission of testimony based on the same AFTE methodology in Johnson. And as in that case, the district court carefully applied the Daubert factors here. And the expert was careful not to overstate the accuracy of his claim that the fired bullet matched the gun found near Romero-Lobato, making clear on cross-examination that he could not exclude the possibility that it had been fired from another gun. Did he make any other statements that sort of qualified his testimony? No. Twice on cross-examination he did state that he could not exclude the possibility that it came from other guns. But on the front end, when he was on direct testimony, direct examination, he testified in unqualified terms that there was a match. But it's important to note, I think, that he didn't say there definitely was a match. Exactly. I think the idea that it's unqualified doesn't mean that he said there was certainly a match or with infallibility there was a match. It was simply unqualified. And when that was drilled down on cross-examination, defense counsel asked, could he exclude all other guns as potential sources, and he definitively said no. Romero-Lobato's primary argument in the briefing seemed to be that there should be a categorical rule barring AFTE methodology altogether. This morning, defense counsel suggests or seems to walk that back a little bit. I realize they maintain that argument, but it seems like the focus is more on a need for some sort of limitation on the front end when these experts testify. I would note on the sort of categorical ban argument in the briefing, we do think that Johnson precludes that argument, the fact that this court has affirmed admission based on the same AFTE methodology. Does it preclude a district court from reaching an opposite conclusion? The district court here had heard this evidence, had a Daubert hearing and said, you know, I just do not trust this. I'm not going to allow this. Is that an abuse of discretion? Not under Johnson, Your Honor. Yeah, Johnson would only preclude a categorical ban from this court. In other words, taking it away from district courts at the gatekeeping function of Daubert. Judges should have and do have wide discretion under the abuse of discretion standard and under Daubert to weigh the current science and the specific expert before it, and we think that's the right approach for this circuit going forward. And to address the point on whether this court would be breaking new ground if it followed the suggestion by counsel here, we think it would. I'm not aware of any court of appeals decision that has limited, that has announced a rule limiting this sort of expert testimony in the manner suggested, and so this would be the first circuit court to do so. On the issue of how definitive the expert could be in the testimony, was that part of the Daubert process in terms of back and forth between the prosecution and the defense on exactly what the line is, how far he would be able to go, or is that something that sort of came out in cross-examination and we're now looking at the record and there's a concern that maybe he didn't qualify it enough? How much of this was dealt with up front? I mean, in general terms, there was a lot of discussion about error rates and sort of a battle of whether the error rate was closer to 1% or 2%. But then that went more to the question of could he testify in the first place? Correct. Yeah. I think that the first place in the record that I recall where this really came up was on direct examination when defense counsel made the objection. The objection was basically that there can't be testimony in definitive terms about a match, and the district court pretty quickly said that's something for cross-examination. I would further note that the district court decisions that defense counsel ticked off this morning do only place limits in the context of specific cases, either saying that experts can only say it's consistent, that the bullet and the gun are consistent, or that there's a reasonable degree of scientific certainty. But again, they do not ban the testimony altogether. If there are no further questions on toolmark analysis testimony, I'll move on to the identification questions that were covered by defense counsel. First, I think it's important to step back and just note the amount of evidence at the attempted robbery trial. In addition to the restaurant owner identifying Romero Lobato as the shooter and the toolmark analysis testimony, there was surveillance footage of the incident that clearly showed the shooter's face. And then several officers also matched that footage to a Facebook photograph of Romero Lobato. And then finally, a getaway car was registered to his mother and sister-in-law. And this, of course, is why the investigation initially focused on Jesus, his brother. But on the identification itself from the restaurant owner, we reject the characterization that the first time the restaurant owner identified Romero Lobato was in court, as I believe it was Judge Brass mentioned, there was this prior encounter where his daughter sent him photographs of Romero Lobato following the carjacking incident. And from those photographs, he sort of did his own investigation and came to the conclusion that Romero Lobato was the person who committed the attempted robbery. And this all came out in front of the jury? That's right. This was explored both on direct examination and during cross-examination. In the examination of Joel or anybody else? At least, so yes, for sure with the examination of Joel, I believe also that the officer who met with Joel that week before trial was asked about, you know, what did he do with the photo lineup. And essentially, he testified that he was shown the photo lineup and Joel said that at that point he thought he could identify someone, but then the officer did not follow up and say which particular one. But going back to the daughter, the daughter showing him the photographs, Joel was questioned both on direct and cross about at some point his daughter showed him a photograph and he then matched that to the surveillance? Yes, Your Honor, and the sites for that are 1028 in the record and 1034. And did anybody else testify about this the time the daughter showed him the photograph or just Joel? Just Joel on that point, I believe. In any event, we don't think that Romero-Lobato has shown a substantial likelihood of misidentification. Again, the in-court identification was subject to cross-examination and it really was a credibility determination as to whether the restaurant owner, Joel, was telling the truth with respect to his daughter showing him the photograph and his coming to the conclusion that Romero-Lobato was the shooter. What if we didn't have the daughter showing him the photograph? I think it's a key part of this case, but I'm just trying to understand sort of where the legal lines get drawn. Imagine we didn't have that and we have him sort of, he's seen some police lineup photos, he's unclear who's who, and then he goes to court and identifies Romero-Lobato. Yes, Your Honor, as you said, that would be a different case. I think it would be a harder case for us, but there would still have to be sort of a determination that the government is creating the unduly suggestive circumstances. I suppose bringing him to court is the state action, but I think what distinguishes that hypothetical from this case is that we don't have state action on the front end. It's the daughter who's making the connection between Romero-Lobato and the surveillance footage. Moving on to the identification in the other trial, the carjacking trial, before we go to the second trial, I guess one thing that gives me pause about the first trial is it seems like there were many, many questionable tactics or procedures, maybe going from maybe sloppy expert testimony to the in-court identification to somewhat confusing testimony from the DNA expert. Maybe each one individually isn't an abuse of discretion, but when you kind of look at it all, it at least gives me pause. What's the response to that? It's just, I guess, tough luck. Each particular issue isn't an error in itself and is cured by cross-examination. That's the thing that gives me pause. There were a lot here on that one trial. Yes, I think, Your Honor, the fact that many issues were raised on appeal, in our view, doesn't mean that there were actually issues. As we argue in the brief, we think there actually were not problems with each of the issues identified in the first trial. But to get at your point more broadly, I think it's important to reiterate just the significant number of pieces of evidence and overlapping evidence that pointed towards Romero-Lobato being the shooter. So you have the tool mark analysis, you have the restaurant owner doing the in-court identification, you have multiple officers testifying that they matched the Facebook photograph to Romero-Lobato, and you have the getaway car that's registered to someone in Romero-Lobato's family. The jury had the surveillance photos or the video, and they could evaluate that for themselves. That was introduced. That's right, Judge Bress. So Government Exhibit 15, I think, is the best sort of montage of all the clips, and it shows several different angles of the restaurant owner, and this was played for the jury during trial. And the best angle is really at the door where you can see the shooter with a white socks hat on and some facial hair, and you can see his face pretty clearly in that image. And so the jury could make its own determination that the man before them in the courtroom was that same person. So turning to the carjacking trial, we concede, as the defense counsel said today, that the show-up procedure was suggestive, but that's only the first step in the analysis. Under the Neal against Biggers factors, we think that the identification didn't violate due process because it was nevertheless sufficiently reliable. And I won't go through those factors now unless you have specific questions about them, but I will highlight that the temporal proximity is important. She made this identification within three hours or so after the carjacking itself, and that's a relatively short period of time. But in any event, and this was argued at closing argument, even if there's some pause about this identification, we think that error would be harmless if there were an error. Ample other evidence showed that Romero Lobato was the carjacker, including Henriette's description to the police before she identified him about his appearance. And then, of course, when the officers found him in the stolen Yukon a few hours later with a gun on the passenger seat and wearing clothing consistent with Henriette's description to the police and with white shoes that are consistent with the surveillance footage of the carjacking. And finally, one last point. On count three, the crime of violence that's predicated on attempted Hobbs Act robbery, we noted this in our brief, but the Supreme Court is currently considering this question on whether attempted Hobbs Act robbery constitutes a crime of violence. And the case is Taylor, and we expect a decision any day now. And so in light of that, we'd ask this court to wait on reaching a decision to see what the Supreme Court does. And that does affect his sentence by several years, I think. Yes, that's right. So if the Supreme Court goes against the current Ninth Circuit approach, then we would ask this court to remand for resentencing because that was a significant chunk of the sentence. Can we go back to the carjacking evidence? Because your opposing counsel did say without the suggestive show-up, the conviction couldn't stand. And so you came back and identified her description to the police. And how was that presented to the jury, through her testimony or officer testimony or written documents? At least officer testimony. I don't recall whether the written document itself was admitted into the record, but at least officer testimony as to the police description. Okay. So you mentioned that. You mentioned the fact that he was obviously found in the vehicle wearing clothing that was consistent with the description she had given. Anything else? His white shoes, and maybe that's part of the clothing, which is consistent not just with her description but also the surveillance footage. You can see the color of his shoes and that he's wearing dark clothing at the time of the carjacking. So your opposing counsel said that the surveillance footage, in her view, was not that probative, but you think it's at least relevant for the white shoes? Basically just for the clothing, yeah. If the court looks at that, you'll see it's from across a parking lot, and so you can only see the carjacker in the top left corner of the screen, but you can tell that he's wearing dark clothing and that he has white shoes on. If there are no further questions, we would ask that this court affirm pending the Supreme Court's decision in Taylor. Thank you. Thank you. So I'll start with a quick point in the record. The defense did, with regards to limitation on the expert's testimony, the defense did raise that pretrial. I would direct the court to 2 ER 372, and it actually continues on to 3, splits up in between volumes, continues on to 3 ER 375 and beyond. And so I direct the court to that for preservation on that issue prior to the cross-examination. Jumping right into, then, the firearms testimony. Now, we made multiple arguments in the briefing, right? So we did argue that this testimony should be precluded altogether, but we also, in the briefing, made the alternative argument that we're focusing here on today. So we're not shifting our position. We maintain that this shouldn't have come in at all. But, again, at a minimum, it needed to have been limited to what could be supported. Johnson doesn't preclude this reading. Johnson, I would argue, actually doesn't preclude either of our arguments here. Of course, we're under abuse of discretion, which means that district courts can exercise their discretion in different ways, and we're simply arguing now that Johnson didn't set forth any categorical rule that this testimony must always be permitted, nor could it, right? Because the explicit premise of Dawbert is that we must consistently be considering new, relevant, reliable science as it comes out. And so our argument here today is that I don't know what was before the district court in Johnson, but I do know what was before the district court in this case, and in this case, it simply should not have come in. Can we just jump to the carjacking evidence? So Mr. Johnson came back and said, here's the other evidence other than the identification and the show-up, and that's sufficient. How do you respond to that? So a couple of things. First of all, I think there was a lot of focus on the clothing here. The clothing was really pretty generic, right? White shirt, white shoes, and I think black sweatshirt. I mean, there's nothing particularly distinctive about those qualities. People wear that kind of stuff every day. And when looking at an overall harmless error review of what this jury was left with in this trial, we'd submit that it just simply doesn't meet that standard. Turning to then the first issue, I briefly want to address one more point. I see I'm out of time here, so I'll briefly just state that the photo that was shown to Mr. Romero-Lobato by his daughter, because I know the court had some questions about that. Again, we maintain that that wasn't an identification at all, but certainly it made the in-court identification inherently more suggestive. We'd ask this court to consider all circumstances of what occurred leading up to that identification in court, and at bottom, cross-examination for credibility cannot be considered a substitute for an initial screening for reliability. So unless the court has any further questions for me, we would ask the court to reverse on this. Thank you both for your very helpful argument. The case has been submitted.
judges: LEE, BRESS, Fitzwater